UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| SUNCOAST WATERKEEPER, TAMPA BAY WATERKEEPER, and OUR CHILDREN'S EARTH FOUNDATION, | Civil Case No.:  8:20-cv-1160 |
| Plaintiffs, | |
| vs. | |
| TRADEMARK METALS RECYCLING LLC, | |
| Defendant. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

SUNCOAST WATERKEEPER ("SCWK"), TAMPA BAY WATERKEEPER ("TBWK"), and OUR CHILDREN'S EARTH FOUNDATION ("OCE") (collectively, "Plaintiffs"), by and through their counsel, hereby allege:

## I.    JURISDICTION AND VENUE

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or "the Act").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.      On March 10, 2020, Plaintiffs provided notice of Defendant's violations of the Act, and of Plaintiffs' intention to file suit against Defendant ("notice letter"), to the

1

Administrator of the United States Environmental Protection Agency ("EPA"); the Regional Administrator of EPA Region 4; the Secretary of the Florida Department of Environmental Protection ("DEP"); the Director of the Southwest District of the DEP; and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of Plaintiffs' notice letter is attached as Exhibit A, and is incorporated by reference.

3.     More than sixty days have passed since notice was served on Defendant and the State and federal agencies.  Plaintiffs are informed and believe, and thereupon allege, that neither the EPA nor the State of Florida has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.  This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.     Venue is proper in the Middle District of Florida pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## II.  <u>INTRODUCTION</u>

5.     Defendant, a scrap metal recycler, discharges polluted stormwater from six metal recycling yards in the Tampa Bay and Sarasota Bay area.  These discharges are in violation of the Clean Water Act and the State of Florida's Multi-Sector Generic Permit for Stormwater Discharge Associated with Industrial Activity.

6.     Florida's Multi-Sector Generic Permit is a National Pollution Discharge Elimination System ("NPDES") permit required under the Act that is issued by the DEP under the authority of Florida Statute Section 403.0885, which authorizes Florida to implement the NPDES program pursuant to authority delegated to the State of Florida by the EPA.  Pursuant to Florida Administrative Code ("F.A.C.") Rule 62-621.300(5)(a), Florida adopted the EPA's original Multi-Sector General Permit issued on September 29, 1995 (60 Fed. Reg. 50804) and subsequent corrections and modifications as amended on February 9, 1996 (61 Fed. Reg. 5248), February 20, 1996 (61 Fed. Reg. 6412), August 7, 1998 (63 Fed. Reg. 42534), September 30, 1998 (63 Fed. Reg. 52430), and January 19, 1999 (64 Fed. Reg. 2898) (hereinafter collectively

referred to as the "MSGP").  Defendant's violations of the substantive and procedural requirements of the MSGP and the Act are ongoing and continuous.

7.      With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations, such as those conducted by Defendant, pour into storm drains and local waterways.  In most of the Sarasota Bay and Tampa Bay area, storm water flows untreated either directly, or through municipal storm drain systems into Sarasota Bay, Tampa Bay, and other receiving waters.  Stormwater pollution accounts for the majority of the pollution entering the Sarasota Bay and Tampa Bay environment each year.  The effects of nonpoint source pollutants on specific waters vary and may not always be fully assessed.  Stormwater pollution poses a health risk to humans, harms marine life, closes beaches, contaminates the ocean, and harms the environment. These contaminated storm water discharges can and must be controlled for the Sarasota Bay and Tampa Bay ecosystems to regain their health.

8.      Tampa and Sarasota Bay area waters are ecologically sensitive estuarine systems with special aesthetic, economic and recreational significance for people living in the surrounding communities.  Included amongst these resources are specially recognized and protected Aquatic Preserves and designated Outstanding Florida Waters, pursuant to 62-302.400 F.A.C., as worthy of special water quality protections because of their natural attributes. Portions of the Tampa and Sarasota Bay estuaries, which receive toxic metals and other contaminants in storm water discharges from Defendant's industrial activities are listed on the State of Florida's Clean Water Act Section 303(d) list of impaired water bodies.  A water body that is listed as impaired cannot support its designated beneficial uses.  The beneficial uses of the waters that receive pollutants from Defendant's industrial stormwater discharges include habitat support for commercial fishing and sport fishing, estuarine habitat, wildlife habitat, fish migration, fish spawning, preservation of rare and endangered species, shellfish propagation and harvesting, contact and non-contact water recreation, industrial service and agricultural water supply, and navigation.  DEP Water Quality Standards 62-302 (2010).

9.      Tampa Bay and Sarasota Bay area waters provide essential habitat for dozens of

fish and bird species as well as macro-invertebrate and invertebrate species.  Storm water contaminated with sediment, heavy metals, and other pollutants harm the special aesthetic and recreational significance that Tampa Bay and Sarasota Bay area waters have for people in the surrounding communities.  The public's use of Tampa Bay and Sarasota Bay area waters for recreation, wildlife observation, aesthetic enjoyment, educational study, and spiritual contemplation exposes many people to toxic metals and other contaminants in storm water discharges and impairs those activities.

### III.    **PARTIES**

10.      Plaintiff Suncoast Waterkeeper is a non-profit public benefit corporation with members throughout Southwest Florida, including Pinellas, Hillsborough, Sarasota, Manatee, and Charlotte Counties.  SCWK is dedicated to protecting and restoring the Florida Suncoast's waterways on behalf of its members through enforcement, fieldwork, advocacy, and environmental education for the benefit of the communities and SCWK's members that rely upon these precious coastal resources.  To further its mission, SCWK actively seeks federal and state implementation of the Clean Water Act, and, where necessary, directly initiates enforcement actions on behalf of itself and its members.  SCWK has been registered as a non-profit corporation in Florida since 2012 and has maintained its good and current standing in Florida since that time.  SCWK is a licensed member of Waterkeeper Alliance, Inc., an international non-profit environmental organization, made up of over 300 separate Waterkeeper programs, such as SCWK.  SCWK's office is located in Sarasota, Florida.

11.      Members of SCWK use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause, pollutants to be discharged.  Members of SCWK use those waters for fishing, boating, body contact water sports and other forms of recreation, wildlife observation, aesthetic enjoyment, educational study, and spiritual contemplation.  Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of SCWK's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Act and the MSGP.  The relief

sought herein will redress the harms to SCWK caused by Defendant's activities.

12.     Plaintiff Tampa Bay Waterkeeper is a non-profit public benefit corporation organized under the laws of the State of Florida with members throughout the Tampa Bay watershed.  TBWK is dedicated to protecting and improving the Tampa Bay watershed while ensuring swimmable, drinkable and fishable water for all.  TBWK's approach combines sound science, policy advocacy, grassroots community engagement and education to stand up for clean water together as a community, ensuring a clean and vibrant future for the Tampa Bay watershed.  To further its mission, TBWK actively seeks federal and state implementation of the Clean Water Act, and, where necessary, directly initiates enforcement actions on behalf of itself and its members.  TBWK has been registered as a non-profit corporation in Florida since 2017 and, like SCWK, is a licensed member of Waterkeeper Alliance, Inc.  TBWK's office is located in St. Petersburg, Florida.

13.     Members of TBWK use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause, pollutants to be discharged.  Members of TBWK use those waters for fishing, boating, body contact water sports and other forms of recreation, wildlife observation, aesthetic enjoyment, educational study, and spiritual contemplation.  Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of TBWK's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Act and the MSGP.  The relief sought herein will redress the harms to TBWK caused by Defendant's activities.

14.     Plaintiff Our Children's Earth Foundation is a non-profit environmental organization with members living throughout western Florida, including members that live in close proximity to Tampa and Sarasota Bays.  OCE's mission is to promote public awareness of domestic and international human rights issues and environmental impacts through education, art, and private enforcement actions for the benefit of children and other populations who are the most vulnerable to pollution.  OCE seeks to prevent environmental damage wherever possible and ensure that appropriate environmental protection statutes are being followed.  Throughout its

20-year history, OCE has regularly initiated enforcement actions on behalf of itself and its members.  OCE is based in Florida and California.

15.     Members of OCE use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause, pollutants to be discharged.  Members of OCE use those waters to regularly participate in water-related activities including swimming, paddling, fishing, boating, observing wildlife, surfing and wind-surfing, studying ecosystems, and spiritual practices.  Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of OCE's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Act and the MSGP.  The relief sought herein will redress the harms to OCE caused by Defendant's activities.

16.     Plaintiffs bring this action on behalf of its members, respectively.  Plaintiffs' interest in reducing Defendant's discharges of pollutants into Tampa Bay and Sarasota Bay and their tributaries and requiring Defendant to comply with the requirements of the MSGP are germane to each Plaintiff organization's purposes.  Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of any of the Plaintiff organizations.

17.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiffs and one or more of each of their members, for which harm they have no plain, speedy or adequate remedy at law.

18.     Defendant TRADEMARK METALS RECYCLING LLC ("Trademark Metals") is a corporation that owns and/or operates the industrial facilities located at the following addresses: 5220 Dover St. in Tampa, FL 33619 ("Sutton Facility"); 4943 Port Sutton Rd., Tampa, FL 33619 ("Port Sutton Shredder Facility"); 3310 Port Sutton St., Tampa, FL 33619 ("Export Yard Facility"); 11324 E. US Hwy 92., Seffner, FL 33584 ("Seffner Facility"); 1735 Myrtle St., Sarasota, FL 34234 ("Sarasota Facility"); and 2032 Gentry St., Clearwater, FL 33765 ("Clearwater Facility") (collectively referred to as the "TMR Facilities" or the "Facilities").

IV.     **STATUTORY BACKGROUND**

**Clean Water Act**

19.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

20.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program.  33 U.S.C. § 1342(p).  It authorizes the EPA to issue NPDES permits directly and also to delegate the authority to issue NPDES permits to state agencies.

21.     States with EPA-approved NPDES permit programs are authorized to regulate industrial storm water discharges through individual permits issued to dischargers or through general permits that cover a category of dischargers. 33 U.S.C. § 1342(p).

22.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized the DEP to issue NPDES permits including general NPDES permits in Florida.

23.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements.  33 U.S.C. §§ 1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day per violation for all violations occurring on or before November 2, 2015; $55,800 per day for violations occurring thereafter, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365.  *See also* 40 C.F.R. §§ 19.1 - 19.4.

**Florida's MSGP**

24.     The DEP elected to issue the MSGP as the statewide general permit for industrial

7

storm water discharges.  Thus, Florida has a single, statewide general permit applicable to all industrial storm water dischargers.

25.     In order to discharge storm water lawfully in Florida, industrial dischargers must obtain coverage under and comply with the terms of the MSGP or obtain and comply with an individual NPDES permit.  33 U.S.C. § 1311(a).

26.      The MSGP contains a variety of substantive and procedural requirements that all dischargers must meet.

27.     Part XI.N of the MSGP pertains to Sector N facilities.  These are facilities that possess a Standard Industrial Classification ("SIC") Code of 5093.  Sector N facilities discharge storm water associated with industrial activity from scrap recycling and waste recycling facilities.  In addition to the general requirements that the MSGP imposes on all dischargers, Part XI.N of the MSGP imposes certain additional specific terms and conditions on Sector N Facilities.

28.     The MSGP is built on the expectation that its requirements will predominantly be met through a permittee's use of best management practices ("BMPs").  BMPs can take a wide variety of forms, from frequent sweeping to making structural modifications such as roofing or installing stormwater filtration and treatment, as necessary.

29.     The Clean Water Act requires that any NPDES permit issued by a state must apply and insure compliance with, among other things, the Act's technology-based standards for discharges of pollution.  *See* 33 U.S.C. § 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311).  In turn, the Act's technology-based standards dictate that, with respect to toxic and non-conventional pollutants (i.e. most pollutants), permitted dischargers shall apply "the best available technology economically achievable for such category or class [of permitted dischargers], which will result in reasonable further progress towards the national goal of eliminating the discharge of all pollutants . . . ."  33 U.S.C. § 1311(b)(2)(A).  The Act also sets a different standard, "application of the best conventional pollutant control technology" for a defined set of five "conventional pollutants".  Id. §

1311(b)(2)(E).[1]

30.      Accordingly, the MSGP requires permittees to use BMPs that reflect, and prohibits the discharge of pollutants above the level commensurate with, application of the best available technology economically achievable ("BAT"), for toxic and non-conventional pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants.  *See* 60 Fed. Reg. at 50812; *see also* MSGP § XI.N.3.a.3, 60 Fed Reg. at 51190.

31.      The MSGP also requires dischargers to develop and implement a storm water pollution prevention plan ("SWPPP").  MSGP § IV.  Among other things, the SWPPP records the BMPs applied at a particular industrial facility.  Sector N Facilities must develop and implement a SWPPP that comports with several requirements of Part XI.N of the MSGP.  Through the SWPPP, requirements in Part XI.N of the MSGP implement its BAT/BCT requirements for Sector N facilities by requiring that the pollution prevention plan minimize pollution and requiring specific BMPs to effectuate such minimization.  *See* MSGP Fact Sheet § VI.B, 60 Fed. Reg. at 50812 ("The pollution prevention or BMP requirements in this permit operate as limitations on effluent discharges that reflect the application of BAT/BCT.")

32.      The MSGP provides that: "[T]he plan shall describe and ensure the implementation of practices that are to be used to reduce the pollutants in storm water discharges associated with industrial activity at the facility and to assure compliance with the terms and conditions of this permit.  Facilities must implement the provisions of the storm water pollution prevention plan required under this part as a condition of this permit."  MSGP § IV, 60 Fed. Reg. at 51115.

33.      Facilities subject to Sector N must include, *inter alia*, the following in their SWPPPs: (1) identification of all the members of a stormwater pollution prevention team responsible for developing and implementing the SWPPP; (2) a description of potential pollutant

---

[1] "Conventional pollutants" are defined by statute, 33 USC 1314(a)(4), and by regulation, 40 CFR 401.16, to include: biochemical oxygen demand, total suspended solids, pH, fecal coliform, and oil and grease.

sources; (3) a site map including, *inter alia*, outfall locations, types of discharges in the drainage areas, location where significant materials are exposed to precipitation, monitoring locations, and flow directions; (4) an inventory of the types of materials at the site that may be exposed to precipitation; (5) a list of significant spills and leaks of toxic or hazardous pollutants that occurred at areas that are exposed to precipitation; (6) a summary of existing discharge sampling data; (7) a narrative description of potential pollutant sources from various activities; (8) a description and implementation of appropriate storm water management controls (including many specific requirements, detailed below); (9) spill prevention and response measures; (10) a quarterly inspection program; (11) an employee training program; and (12) a supplier notification program.  MSGP §§ XI.N.3.a(1), XI.N.3.a(2)(a)-XI.N.3.a(2)(e), XI.N.3.a(3)(a)(i)-XI.N.3.a(3)(a)(xii) (requirements for scrap and waste recycling facilities (nonsource-separated, nonliquid recyclable wastes)).

34.     Part XI.N.3.a(3)(a) of the MSGP requires that Sector N facilities develop and implement appropriate storm water management controls including the following:

- Measures and controls to "minimize contact of storm water runoff with stockpiled materials, process materials, and nonrecyclable wastes," as well as "measures to minimize the extent of storm water contamination from those areas."  The facility operator must consider using the following BMPs or their equivalents: diversion of runoff, media filtration, silt fencing, and oil/water separators, sumps, and dry adsorbents.  Part XI.N.3.a(3)(a)(ii).

- "measures necessary to minimize contact of surface runoff with residual cutting fluids."  This includes a requirement to consider implementing one of two (or a combination) types of measures – either storage of turnings under cover or a dedicated containment area for turnings.  Part XI.N.3.a(3)(a)(iii).

- "measures and controls to minimize residual liquids and accumulated particulate matter, originating from scrap and recyclable waste materials stored indoors or under cover, from coming in contact with surface runoff."  This part requires that dischargers consider including various housekeeping measures.  Part XI.N.3.a(3)(a)(iv).

- address "areas where scrap and waste processing equipment are sited" by adopting "measures and controls to minimize surface runoff from coming in contact with scrap processing equipment."  Part XI.N.3.a(3)(a)(v).

- provide appropriate source control, stabilization measures, nonstructural, structural controls or equivalent for areas at the facilities that are associated with industrial activity that have a high potential for soil erosion and suspended solids loadings.  This requires consideration of a variety of erosion and sediment control BMPs.  Part XI.N.3.a(3)(a)(vii).

- provide for a detention or retention basin or equivalent when BMPs installed pursuant to Part XI.N.3.a(3)(a)(vii) do not prove sufficient.  Part XI.N.3.a(3)(a)(viii).

60 Fed. Reg. at 51190–93 (detailing specific requirements for facilities processing non-liquid recyclable waste).

35.     In addition to requiring that permittees select and install BMPs and develop a SWPPP to meet the Clean Water Act's standards, the MSGP also requires facility operators to implement monitoring and reporting requirements that allow facility operators to determine whether they have adequately reduced the level of pollutants in storm water runoff through the development and proper implementation of the facility's SWPPP.  Permittees with scrap recycling and waste recycling facilities must monitor their storm water discharges at least quarterly during the second and fourth year of the permit term.  They must provide "the date and duration (in hours) of the storm event(s) sampled; rainfall measurements or estimates (in inches) of the storm event that generated the sampled runoff; the duration between the storm event sampled and the end of the previous measurable (greater than 0.1 inch (") rainfall) storm event; and an estimate of the total volume (in gallons) of the discharge sampled."  MSGP § XI.N.5.a., 60 Fed. Reg. at 51195.  They must collect samples during sampling periods of January to March, April to June, July to September, and October to December.  *Id*. at XI.N.5.a(1).  Samples must be "collected from the discharge resulting from a storm event that is greater than 0.1" in magnitude and that occurs at least 72 hours from the previously measurable (greater than 0.1" rainfall) storm event."  *Id*. at XI.N.5.a.(2).

36.     In addition to analytic monitoring, dischargers must also take quarterly samples and make visual observations of representative discharges. MSGP § XI.N.5.c, 60 Fed. Reg. at 51196–97. Dischargers must document their observations of color, odor, clarity, floating solids, settled solids, suspended solids, foam, oil sheen, and other obvious indicators of storm water

pollution at each discharge location. *Id.* These observations are to be recorded and kept onsite with the SWPPP. *Id.* Based on the results of the analytic and observational monitoring, dischargers are required to evaluate the need for additional BMPs and modifications to the facility's SWPPP. 60 Fed. Reg. at 50820–27, 50829–30.

37.     Part XI.N.3.a.4 of the MSGP requires Sector N dischargers to conduct comprehensive site compliance evaluations at least once per year. 60 Fed. Reg. at 51995. This requires a comprehensive review of a facility and its storm water pollution control measures. The outcome of this evaluation requires revisions to a facility's SWPPP. *Id.*

38.     For Sector N facilities, the MSGP establishes the following cut-off concentrations for pollutants of concern: chemical oxygen demand ("COD") – 120 mg/L, total suspended solids ("TSS") – 100 mg/L, total recoverable aluminum – 0.75 mg/L, total recoverable copper – 0.0636 mg/L, total recoverable iron – 1.0 mg/L, total recoverable lead – 0.0816 mg/L, total recoverable zinc – 0.117 mg/L. MSGP, § XI.N.5.a; 61 Fed. Reg. 5248 (February 9, 1996) (amending cut-off concentration for zinc). The cut-off concentrations are used "to assess the effectiveness of the pollution prevention plan and to help ensure that a reduction of pollutants is realized." 60 Fed. Reg. at 50843 (Monitoring and Reporting Requirements). They "provide a reasonable target for controlling storm water contamination by pollution prevention plans." *Id.* at 51076.

39.     The cut-off concentrations are guidelines for determining whether a facility has implemented the requisite BAT/BCT level of control measures. Further, exceedances of cut-off concentrations are reason for concern that pollution may have reached a level "at which a storm water discharge could potentially impair, or contribute to impairing water quality or affect human health from ingestion of water or fish." 60 Fed. Reg. at 50824–25.

40.     The MSGP does not provide for any mixing zones by dischargers. The MSGP does not provide for any receiving water dilution credits to be applied by dischargers.

**Beneficial Uses of Florida Surface Waters**

41.     The State of Florida has identified beneficial uses and designated all surface waters of the State of Florida as Class III – Recreation, Propagation and Maintenance of a

Healthy, Well-Balanced Population of Fish and Wildlife, except for certain waters which are described in subsection 62-302.400(16), F.A.C.  Rule 62-302.400(15), F.A.C.  "Class I, II, and III surface waters share water quality criteria established to protect fish consumption, recreation and the propagation and maintenance of a healthy, well-balanced population of fish and wildlife."  Rule 62-302.400(4), F.A.C.

42.     The State of Florida has provided a number of exceptions to the designation of certain waters as Class III, affording certain waters in various counties with a more protective designation of Class II – which includes the beneficial uses of Shellfish Propagation or Harvesting.

43.     Certain Florida waters, including but not limited to the coastal waters of Pinellas County and the Sarasota Bay Estuarine System, are afforded special significance and protection as an "Outstanding Florida Water," pursuant to 62-302.400 F.A.C.

44.     The Sarasota Bay Estuarine System is additionally designated as a "Special Water" having been found to have exceptional recreational or ecological significance and that the environmental, social, and economic benefits of the designation outweigh the environmental, social, and economic costs (Rule 62- 302.700(5), F.A.C.).

## V.     STATEMENT OF FACTS

### Metal Recycling Facilities

45.     Metal recycling facilities, especially those with outdoor stockpiling, processing and segregation of materials, have been identified as a major source of storm water contamination.  Scrap metal in different stages of corrosion and decay may release a variety of harmful substances including but not limited to heavy metals, fuel, oil, lubricants, polychlorinated biphenyls, grease, lead acid, lead oxides, chlorinated solvents, asbestos, ethylene glycol, paint, and chemical residues.  60 Fed. Reg. 50804, 50953–63 (listing common pollutants associated with Sector N—scrap and waste recycling facilities—as of 1995); *see also* id. at 51189–97 (outlining special requirements for Sector N); EPA, *Industrial Stormwater Fact Sheet Series: Sector N*, EPA-833-F-06-029, at 2–4 (Dec. 2006), https://www.epa.gov/sites/production/

files/2015-10/documents/sector_n_scraprecycling.pdf [hereinafter *Sector N Fact Sheet*] (listing common pollutants associated with Sector N, as of 2006).

46.     In addition to the storage and processing of various sources of scrap metal, such facilities also conduct vehicle operation and maintenance and equipment operation and storage. Fork lifts, trucks, and other vehicles track debris, particulate matter, and other contaminants to areas on and off the premises.  Vehicles also expose many other sources of pollution to the elements, including gasoline, diesel fuel, anti-freeze, battery fluids, and hydraulic fluids.

**Stormwater Pollution at TMR Facilities**

47.     TMR has certified that all of the TMR Facilities are classified under SIC Code 5093, meaning that they are primarily engaged in assembling, breaking up, sorting, and wholesale distribution of scrap and waste materials.  The Facilities receive a variety of waste materials, primarily ferrous and non-ferrous metals, and store, process, crush, compact, and in some cases shred these materials.  The majority of activity and storage at each facility takes place outdoors, where pollutants are exposed to stormwater.

48.     Part XI.N of the MSGP is divided into three separate classes of recycling facilities.  The TMR Facilities all fall under the initial category: "scrap recycling and waste recycling facilities (non-liquid recyclable waste)."

49.     On information and belief, Plaintiffs allege that each of the TMR Facilities releases the following pollutants into the immediate environment: toxic metals such as aluminum, copper, iron, lead, zinc, mercury, cadmium; as well as petroleum products including oil, gasoline, grease, and diesel fuel, battery fluids, acids and solvents, and total organic carbon, suspended solids, and pH-altering substances.

50.     On information and belief, Plaintiffs allege that other significant potential pollutant sources at the TMR Facilities include heavy metals, fuel, oil, lubricants, polychlorinated biphenyls, grease, lead acid, lead oxides, chlorinated solvents, asbestos, ethylene glycol, paint and paint thinner, chemical residues, kerosene, machine cutting fluid, waste sand, and machine shop filings.

51.     The large number of trucks and other vehicles entering and leaving the TMR Facilities from the driveways track pollutants off-site onto public streets where rainfall washes these pollutants into storm drains that discharge into waters of the United States.

52.     On information and belief, Plaintiffs allege that storm water flows over the surface of the TMR Facilities where industrial activities occur including, but not limited to, receiving materials and product transport, processing of metals, maintenance of forklifts and equipment, and areas where airborne materials associated with the industrial processes at the TMR Facility may settle onto the ground.  Plaintiffs are informed and believe and thereupon allege that storm water flowing over these areas collects suspended sediment, dirt, metals, and other pollutants as it flows towards the TMR Facilities' respective storm water discharge locations.

53.     On information and belief, Plaintiffs allege that the majority of storm water discharges from each of the TMR Facilities contain storm water that is commingled with runoff from areas at the respective facilities where industrial processes occur.

**Permit Violations at TMR Facilities**

54.     As noted above, MSGP permittees must limit pollution in industrial stormwater to a level commensurate with the federal BAT and BCT standards; develop and implement SWPPPs that set forth the best management practices that the permittee is using to meet those federal standards; conduct routine inspections and monitoring, and report accurately the results of that monitoring.

55.     On information and belief, Plaintiffs allege that Trademark Metals has failed to develop and/or implement sufficient BMPs at each of the TMR Facilities to limit pollution in industrial stormwater to a level commensurate with the federal BAT and BCT standards:

- Trademark Metals does not prevent storm water flows from coming into contact with the sources of contaminants.

- On information and belief, Plaintiffs allege that each of the TMR Facilities lacks sufficiently well-maintained structural controls and practices to minimize

exposure of pollutants to stormwater, to retain all storm water on site; or to prevent contaminants from entering into storm water.  On information and belief, Plaintiffs allege that Trademark Metals does not sufficiently treat contaminated storm water prior to discharge from each of the TMR Facilities.

56.     On information and belief, Plaintiffs allege that since at least March 20, 2015, Trademark Metals has failed to develop and/or implement an adequate SWPPP at each of the TMR Facilities in accordance with the requirements of Part XI.N.3 of the MSGP.  The SWPPPs for the TMR Facilities do not include, and Trademark Metals has not implemented, the required minimum and industry specific BMPs necessary to reduce pollutant levels in discharges to BAT and BCT levels.  This is evidenced by sources of storm water contamination at each of the TMR Facilities, contaminant tracking around and off the Facilities, and the Facilities' discharges of storm water contaminated above pollutant levels without the requisite application of BAT/BCT. The SWPPPs for each of the TMR Facilities fail, *inter alia*, to adequately identify all storm water discharge locations and to describe all pollutant generating activities.  Trademark Metals' failure to prepare and/or implement an adequate SWPPP in all the above respects constitute violations of the MSGP.  As a result, the discharges of stormwater associated with industrial activity from the Facilities are not in accordance with the effluent limitations contained in Trademark Metals' NPDES permits, and therefore Trademark Metals is violating Sections 301 and 402 of the Clean Water Act at each of the TMR Facilities.

57.     On information and belief, Plaintiffs allege that since at least March 20, 2015, Trademark Metals has failed at each of the TMR Facilities to conduct Part XI.N.3.a.4 of the MSGP's required comprehensive site compliance evaluations at least once per year and to accordingly revise each Facility's SWPPP.

58.     On information and belief, Plaintiffs allege that since at least March 20, 2015, Trademark Metals has failed to develop and/or implement an adequate monitoring and reporting program at each of the TMR Facilities in accordance with the requirements of Part XI.N.5 of the MSGP.  Plaintiffs allege that Trademark Metals has typically taken storm water samples at each

of the TMR Facilities on dates that were subsequent to large storm events.  This practice is a violation of the MSGP.  It artificially improves the quality of the sampling results – i.e. samples contain lower, unrepresentative levels of pollution – because they were collected after the prior storm event flushed pollutants away from the facility.  On information and belief, Plaintiffs allege that Trademark Metals also frequently reported that no discharges occurred from the TMR Facilities despite evidence of numerous potential sampling events during a given reporting period.

### Violations at Sutton Facility

59.     Defendant owns and/or operates the Sutton Facility, a metal recycling facility located in Tampa, FL.

60.     Based on Plaintiffs' investigation, including a review of the Sutton Facility's Notice of Intent to Use Multi-Sector Generic Permit for Stormwater Discharge Associated With Industrial Activity ("NOI"), aerial photography, and Plaintiffs' information and belief, storm water is collected and discharged from the Sutton Facility via at least two outfalls.

61.     Storm water discharged from the Sutton Facility flows into an unknown tributary that flows into Tampa Bay (collectively, "Sutton Facility Receiving Waters").

62.     The Sutton Facility Receiving Waters are waters of the United States.

63.     The Sutton Facility's current coverage under the MSGP is active from May 18, 2018, through May 17, 2023.  This is a continuation from the Sutton Facility's previous coverage under the MSGP, which ran from May 26, 2013, through May 25, 2018.

64.     Since at least January 31, 2014, Defendant has taken samples or arranged for samples to be taken of storm water discharges at the Sutton Facility.  The sample results were reported in the Sutton Facility's Discharge Monitoring Reports ("DMRs") submitted to the DEP. Defendant certified the accuracy of each of those DMRs.

65.     In DMRs submitted to the DEP, the Sutton Facility has consistently reported high pollutant levels from its storm water sampling results.

66.     The levels of aluminum in storm water detected by the Sutton Facility have

exceeded the cut-off concentration for aluminum of 0.75 mg/L established by the DEP.  For example, on March 6, 2014, the level of aluminum measured at one of the Sutton Facility's storm water outfalls was 2.8 mg/L, which is almost 4 times the cut-off concentration.  Defendant also has measured levels of aluminum in excess of 0.75 mg/L in storm water discharged from the Sutton Facility on January 31, 2014; May 2, 2014; July 16, 2014; November 25, 2014; January 15, 2016; and May 4, 2016.

67.     The levels of copper in storm water detected by the Sutton Facility have exceeded the cut-off concentration for copper of 0.0636 mg/L established by the DEP.  For example, on March 6, 2014, the level of copper measured at one of the Sutton Facility's storm water outfalls was 0.266 mg/L, which is over 4 times the cut-off concentration.  Defendant also has measured levels of copper in excess of 0.0636 mg/L in storm water discharged from the Sutton Facility on January 31, 2014; May 2, 2014; July 16, 2014; November 25, 2014; and May 4, 2016.

68.     The levels of iron in storm water detected by the Sutton Facility have exceeded the cut-off concentration for iron of 1.0 mg/L established by the DEP.  For example, on March 6, 2014, the level of iron measured at one of the Sutton Facility's storm water outfalls was 14.1 mg/L, which is over 14 times the cut-off concentration.  Defendant also has measured levels of iron in excess of 1.0 mg/L in storm water discharged from the Sutton Facility on January 31, 2014; May 2, 2014; July 16, 2014; November 25, 2014; January 15, 2016; May 4, 2016; and August 8, 2016.

69.     The levels of lead in storm water detected by the Sutton Facility have exceeded the cut-off concentration for lead of 0.0816 mg/L established by the DEP.  For example, on March 6, 2014, the level of lead measured at one of the Sutton Facility's storm water outfalls was 0.302 mg/L, which is almost 4 times the cut-off concentration.  Defendant also has measured levels of lead in excess of 0.0816 mg/L in storm water discharged from the Sutton Facility on January 31, 2014; May 2, 2014; and July 16, 2014.

70.     The levels of zinc in storm water detected by the Sutton Facility have exceeded the cut-off concentration for zinc of 0.117 mg/L established by the DEP.  For example, on March

6, 2014, the level of zinc measured at one of the Sutton Facility's storm water outfalls was 1.85 mg/L, which is almost 4 times the cut-off concentration. Defendant also has measured levels of zinc in storm water discharged from the Sutton Facility in excess of 0.117 mg/L on January 31, 2014; May 2, 2014; July 16, 2014; November 25, 2014; January 15, 2016; May 4, 2016; August 8, 2016; and July 24, 2019.

71.     On March 22, 2017, DEP sent Trademark Metals a letter regarding exceedances of the cut-off concentrations for pollutants of concern at the Sutton Facility. This letter requested "appropriate action(s)" to address the exceedances, including, *inter alia*, re-evaluating the effectiveness of the pollution prevention measures and controls identified in the Facility's SWPPP and documenting the results of this review in the SWPPP. On information and belief, Plaintiffs allege that Trademark Metals failed to take appropriate actions to address the exceedances and to then appropriately revise the SWPPP for the Sutton Facility.

72.     On information and belief, Plaintiffs allege that Trademark Metals failed to accurately report the duration between the storm event it sampled at the Sutton Facility and the end of the previous measurable (greater than 0.1" rainfall) storm event, as required by MSGP Part XI.N.5.a(1), for samples taken on the following dates: August 8, 2016; May 4, 2016; and January 15, 2016.

73.     On information and belief, Plaintiffs allege that Trademark Metals failed to take and monitor any samples at the Sutton Facility from four required storm events during 2016 and from four required  storm events during 2019 consistent with the requirements in MSGP Part XI.N.5.a(2)(x).

74.     On information and belief, Plaintiffs allege that since at least March 20, 2015, Defendant has failed to implement BAT and BCT at the Sutton Facility for its discharges of aluminum, copper, iron, lead, zinc, and other pollutants. As of the date of this Complaint, Defendant has failed to implement BAT and BCT.

75.     As a result of Trademark Metals' practices at the Sutton Facility, storm water containing excessive pollutants is being discharged from the Sutton Facility during rain events

into the Sutton Facility Receiving Waters.

76.     Information available to Plaintiffs indicates that Defendant has not fulfilled the requirements set forth in the MSGP for discharges from the Sutton Facility due to the continued discharge of contaminated storm water.  Plaintiffs are informed and believe, and thereupon allege, that all of the violations alleged in this Complaint are ongoing and continuous.

### Violations at Port Sutton Shredder Facility

77.     Defendant owns and/or operates the Port Sutton Shredder Facility, a metal recycling facility located in Tampa, FL.

78.     Based on Plaintiffs' investigation, including a review of the Port Sutton Shredder Facility's NOI, aerial photography, and Plaintiffs' information and belief, storm water is collected and discharged from the Port Sutton Shredder Facility via at least two outfalls.  Storm water discharged from the Port Sutton Shredder Facility flows into an unnamed canal that flows into Hillsborough Bay (collectively, "Port Sutton Shredder Facility Receiving Waters").

79.     Information available to Plaintiffs indicates that the Port Sutton Shredder Facility Receiving Waters are waters of the United States.

80.     The Port Sutton Shredder Facility's current coverage under the MSGP is active from April 14, 2019, through April 13, 2024.  This is a continuation from the Port Sutton Shredder Facility's previous coverage under the MSGP, which ran from May 19, 2014, through May 8, 2019.

81.     Since at least April 28, 2015, Defendant has taken samples or arranged for samples to be taken of storm water discharges at the Port Sutton Shredder Facility.  The sample results were reported in the Port Sutton Shredder Facility's DMRs submitted to the DEP. Defendant certified the accuracy of each of those DMRs.

82.     In DMRs submitted to the DEP, the Port Sutton Shredder Facility has consistently reported high pollutant levels from its storm water sampling results.  Defendant certified the accuracy of each of those DMRs.

83.     The levels of aluminum in storm water detected by the Port Sutton Shredder

Facility have exceeded the cut-off concentration for aluminum of 0.75 mg/L established by the DEP. For example, on July 27, 2015, the level of aluminum measured at one of the Port Sutton Shredder Facility's storm water outfalls was 3.19 mg/L, which is over 4 times the cut-off concentration. Defendant also has measured levels of aluminum in excess of 0.75 mg/L in storm water discharged from the Port Sutton Shredder Facility on June 7, 2017; and July 31, 2017.

84.     The levels of copper in storm water detected by the Port Sutton Shredder Facility have exceeded the cut-off concentration for copper of 0.0636 mg/L established by the DEP. For example, on July 31, 2017, the level of copper measured at one of the Port Sutton Shredder Facility's storm water outfalls was 0.508 mg/L, which is 8 times the cut-off concentration. Defendant also has measured levels of copper in excess of 0.0636 mg/L in storm water discharged from the Port Sutton Shredder Facility on April 28, 2015; June 23, 2015; July 27, 2015; October 27, 2015; February 2, 2017; and June 7, 2017.

85.     The levels of iron in storm water detected by the Port Sutton Shredder Facility have exceeded the cut-off concentration for iron of 1.0 mg/L established by the DEP. For example, on June 7, 2017, the level of iron measured at one of the Port Sutton Shredder Facility's storm water outfalls was 8.49 mg/L, which is over 8 times the cut-off concentration. Defendant also has measured levels of iron in excess of 1.0 mg/L in storm water discharged from the Port Sutton Shredder Facility on April 28, 2015; June 23, 2015; July 27, 2015; October 27, 2015; February 2, 2017; and July 31, 2017.

86.     The levels of lead in storm water detected by the Port Sutton Shredder Facility have exceeded the cut-off concentration for lead of 0.0816 mg/L established by the DEP. For example, on July 27, 2015, the level of lead measured at one of the Port Sutton Shredder Facility's storm water outfalls was 0.3 mg/L, which is almost 4 times the cut-off concentration. Defendant also has measured levels of lead in excess of 0.0816 mg/L in storm water discharged from the Port Sutton Shredder Facility on April 28, 2015; June 7, 2017; and July 31, 2017.

87.     The levels of zinc in storm water detected by the Port Sutton Shredder Facility have exceeded the cut-off concentration for zinc of 0.117 mg/L established by the DEP in every

storm water sample taken at the facility for the past five years.  For example, on July 27, 2015, the level of zinc measured at one of the Port Sutton Shredder Facility's storm water outfalls was 2.82 mg/L, which is over 24 times the cut-off concentration.  Defendant also has measured levels of zinc in excess of 0.117 mg/L in storm water discharged from the Port Sutton Shredder Facility on April 28, 2015; June 23, 2015; October 27, 2015; February 2, 2017; June 7, 2017; and July 31, 2017.

88.     The levels of chemical oxygen demand in storm water detected by the Port Sutton Shredder Facility have exceeded the cut-off concentration for chemical oxygen demand of 120 mg/L established by the DEP.  For example, on October 27, 2015, the level of chemical oxygen demand measured at one of the Port Sutton Shredder Facility's storm water outfalls was 494 mg/L, which is over 4 times the cut-off concentration.  Defendant also has measured levels of chemical oxygen demand in excess of 120 mg/L in storm water discharged from the Port Sutton Shredder Facility on February 2, 2017; June 7, 2017; and July 31, 2017.

89.     The level of total suspended solids in storm water detected by the Port Sutton Shredder Facility has exceeded the cut-off concentration for total suspended solids of 100 mg/L established by the DEP.  On June 23, 2015, the level of total suspended solids measured at one of the Port Sutton Shredder Facility's storm water outfalls was 111 mg/L.

90.     On information and belief, Plaintiffs allege that Trademark Metals failed to take and monitor any samples from four required storm events during 2017 at the Port Sutton Shredder Facility consistent with the requirements in MSGP Part XI.N.5.a(2).

91.     On information and belief, Plaintiffs allege that since at least March 20, 2015, Defendant has failed to implement BAT and BCT at the Port Sutton Shredder Facility for its discharges of aluminum, copper, iron, lead, zinc, chemical oxygen demand, total suspended solids, and other pollutants.  As of the date of this Complaint, Defendant has failed to implement BAT and BCT.

92.     As a result of Trademark Metals' practices at the Port Sutton Shredder Facility, storm water containing excessive pollutants is being discharged from the Sutton Facility during

rain events into the Port Sutton Shredder Facility Receiving Waters.

93.     Information available to Plaintiffs indicates that Defendant has not fulfilled the requirements set forth in the MSGP for discharges from the Port Sutton Shredder Facility due to the continued discharge of contaminated storm water.  Plaintiffs are informed and believe, and thereupon allege, that all of the violations alleged in this Complaint are ongoing and continuous.

### Violations at Export Yard Facility

94.     Defendant owns and/or operates the Export Yard Facility, a metal recycling facility located in Tampa, FL.

95.     Based on Plaintiffs' investigation, including a review of the Export Yard Facility's NOI, aerial photography, and Plaintiffs' information and belief, storm water is collected and discharged from the Export Yard Facility via at least one outfall.  Storm water discharged from the Export Yard Facility flows into Hillsborough Bay.

96.     Hillsborough Bay is a water of the United States.

97.     The Export Yard Facility's current coverage under the MSGP is active from April 13, 2019, through April 12, 2024.  This is a continuation from the Export Yard Facility's previous coverage under the MSGP, which ran from May 9, 2014, through May 8, 2019.

98.     Since at least January 9, 2015, Defendant has taken samples or arranged for samples to be taken of storm water discharges at the Export Yard Facility.  The sample results were reported in the Export Yard Facility's DMRs submitted to the DEP.  Defendant certified the accuracy of each of those DMRs.

99.     In DMRs submitted to the DEP, the Export Yard Facility has consistently reported high pollutant levels from its storm water sampling results.

100.    The level of aluminum in storm water detected by the Export Yard Facility has exceeded the cut-off concentration for aluminum of 0.75 mg/L established by the DEP.  On October 27, 2015, the level of aluminum measured at the Export Yard Facility's storm water outfall was 2.02 mg/L, which is almost 3 times the cut-off concentration.

101.    The levels of copper in storm water detected by the Export Yard Facility have

exceeded the cut-off concentration for copper of 0.0636 mg/L established by the DEP.  On October 27, 2015, the level of copper measured at the Export Yard Facility's storm water outfall was 0.189 mg/L, which is almost 3 times the cut-off concentration.  Defendant also measured levels of copper in excess of 0.0636 mg/L in storm water discharged from the Export Yard Facility on February 22, 2017.

102.    The levels of iron in storm water detected by the Export Yard Facility have exceeded the cut-off concentration for iron of 1.0 mg/L established by the DEP.  For example, on October 27, 2015, the level of iron measured at the Export Yard Facility's storm water outfall was 5.1 mg/L, which is over 5 times the cut-off concentration.  Defendant also has measured levels of iron in excess of 1.0 mg/L in storm water discharged from the Export Yard Facility on June 6, 2017; and July 31, 2017.

103.    The level of lead in storm water detected by the Export Yard Facility has exceeded the cut-off concentration for lead of 0.0816 mg/L established by the DEP.  On October 27, 2015, the level of lead measured at the Export Yard Facility's storm water outfall was 0.0863 mg/L.

104.    The levels of zinc in storm water detected by the Export Yard Facility have exceeded the cut-off concentration for zinc of 0.117 mg/L established by the DEP in almost every storm water sample taken at the facility for the past five years.  For example, on October 27, 2015, the level of zinc measured at the Export Yard Facility's storm water outfall was 0.838 mg/L, which is over 7 times the cut-off concentration.  Defendant also has measured levels of zinc in excess of 0.117 mg/L in storm water discharged from the Export Yard Facility on April 23, 2015; June 25, 2015; July 27, 2015; October 27, 2015; February 22, 2017; June 6, 2017; and July 31, 2017.

105.    The levels of chemical oxygen demand in storm water detected by the Export Yard Facility have exceeded the cut-off concentration for chemical oxygen demand of 120 mg/L established by the DEP.  On February 22, 2017, the level of chemical oxygen demand measured at one of the Export Yard Facility's storm water outfalls was 173 mg/L.  Defendant also

measured a level of chemical oxygen demand in excess of 120 mg/L in storm water discharged from the Export Yard Facility on October 27, 2015.

106.    On March 28, 2018, the DEP sent Trademark Metals a letter regarding exceedances of the cut-off concentrations for pollutants of concern at the Export Yard Facility. This letter requested "appropriate action(s)" to address the exceedances, including, *inter alia*, re-evaluating the effectiveness of the pollution prevention measures and controls identified in the Facility's SWPPP and documenting the results of this review in the SWPPP.  On information and belief, Plaintiffs allege that Trademark Metals failed to take appropriate actions to address the exceedances and to then appropriately revise the SWPPP for the Export Yard Facility.

107.    On information and belief, Plaintiffs allege that Trademark Metals failed to accurately report the duration between the storm event it sampled at the Export Yard Facility and the end of the previous measurable (greater than 0.1" rainfall) storm event, as required by MSGP Part XI.N.5.a(1), for storm water samples taken on the following dates: January 9, 2015; April 23, 2015; June 25, 2015; October 27, 2015; and February 22, 2017.

108.    On information and belief, Plaintiffs allege that Trademark Metals failed to take and monitor any samples from four required storm events during 2017 or from four required storm events during 2015 at the Export Yard Facility consistent with the requirements in MSGP Part XI.N.5.a(2).

109.    On information and belief, Plaintiffs allege that since at least March 20, 2015, Defendant has failed to implement BAT and BCT at the Export Yard Facility for its discharges of aluminum, copper, iron, lead, zinc, chemical oxygen demand, and other pollutants.  As of the date of this Complaint, Defendant has failed to implement BAT and BCT.

110.    As a result of Trademark Metals' practices at the Export Yard Facility, storm water containing excessive pollutants is being discharged from the Sutton Facility during rain events into Hillsborough Bay.

111.    Information available to Plaintiffs indicates that Defendant has not fulfilled the requirements set forth in the MSGP for discharges from the Export Yard Facility due to the

continued discharge of contaminated storm water.  Plaintiffs are informed and believe, and thereupon allege, that all of the violations alleged in this Complaint are ongoing and continuous.

### Violations at Seffner Facility

112.    Defendant owns and/or operates the Seffner Facility, a metal recycling facility located in Seffner, FL.

113.    Based on Plaintiffs' investigation, including a review of the Seffner Facility's NOI, aerial photography, and Plaintiffs' information and belief, storm water is collected and discharged from the Seffner Facility via at least one outfall.  Defendant's NOI maintains that storm water discharged from the Seffner Facility flows into "an unnamed lake 0.4 mile to the SSW of the facility" ("Seffner Facility Receiving Water").

114.    Information available to Plaintiffs indicates that the Seffner Facility Receiving Water is a water of the United States.

115.    The Seffner Facility's current coverage under the MSGP is active from April 13, 2019, through April 12, 2024.  This is a continuation from the Seffner Facility's previous coverage under the MSGP, which ran from May 9, 2014, through May 8, 2019.

116.    Since at least February 2, 2015, Defendant has taken samples or arranged for samples to be taken of storm water discharges at the Seffner Facility.  The sample results were reported in the Seffner Facility's DMRs submitted to the DEP.  Defendant certified the accuracy of each of those DMRs.

117.    In DMRs submitted to the DEP, the Seffner Facility has consistently reported high pollutant levels from its storm water sampling results.

118.    The levels of aluminum in storm water detected by the Seffner Facility have exceeded the cut-off concentration for aluminum of 4.78 mg/L established by the DEP.  On June 7, 2017, the level of aluminum measured at the Seffner Facility's storm water outfall was 4.78 mg/L, which is over 6 times the cut-off concentration.  Defendant also measured a level of aluminum in excess of 0.75 mg/L in storm water discharged from the Seffner Facility on February 2, 2015.

119.     The level of copper in storm water detected by the Seffner Facility has exceeded the cut-off concentration for copper of 0.0636 mg/L established by the DEP.  On June 17, 2017, the level of copper measured at the Seffner Facility's storm water outfall was 0.0971 mg/L, which is over 1.5 times the cut-off concentration.

120.     The levels of iron in storm water detected by the Seffner Facility have exceeded the cut-off concentration for iron of 1.0 mg/L established by the DEP.  For example, on June 7, 2017, the level of iron measured at the Seffner Facility's storm water outfall was 5.78 mg/L, which is almost 6 times the cut-off concentration.  Defendant also has measured levels of iron in excess of 1.0 mg/L in storm water discharged from the Seffner Facility on February 2, 2015; and June 27, 2015.

121.     The level of lead in storm water detected by the Seffner Facility has exceeded the cut-off concentration for lead of 0.0816 mg/L established by the DEP.  On June 7, 2017, the level of lead measured at the Seffner Facility's storm water outfall was 0.141 mg/L, which is almost twice the cut-off concentration.

122.     The levels of zinc in storm water detected by the Seffner Facility have exceeded the cut-off concentration for zinc of 0.117 mg/L established by the DEP in every storm water sample taken at the facility for the past five years.  For example, on September 29, 2015, the level of zinc measured at the Seffner Facility's storm water outfall was 1.04 mg/L, which is almost 9 times the cut-off concentration.  Defendant also has measured levels of zinc in excess of 0.117 mg/L in storm water discharged from the Seffner Facility on February 2, 2015; June 27, 2015; October 27, 2015; and June 7, 2017.

123.     The levels of chemical oxygen demand in storm water detected by the Seffner Facility has exceeded the cut-off concentration for chemical oxygen demand of 120 mg/L established by the DEP.  On June 17, 2017, the level of chemical oxygen demand measured at one of the Seffner Facility's storm water outfalls was 170 mg/L.

124.     The level of total suspended solids in storm water detected by the Seffner Facility has exceeded the cut-off concentration for lead of 100 mg/L established by the DEP.  On June

17, 2017, the level of total suspended solids measured at the Seffner Facility's storm water outfall was 203 mg/L, which is over twice the cut-off concentration.

125.    On April 3, 2018, the DEP sent Trademark Metals a letter regarding exceedances of the cut-off concentrations for pollutants of concern at the Seffner Facility.  This letter requested "appropriate action(s)" to address the exceedances, including, inter alia, re-evaluating the effectiveness of the pollution prevention measures and controls identified in the Facility's SWPPP and documenting the results of this review in the SWPPP.  On information and belief, Plaintiffs allege that Trademark Metals failed to take appropriate actions to address the exceedances and to then appropriately revise the SWPPP for the Seffner Facility.

126.    On information and belief, Plaintiffs allege that Trademark Metals failed to accurately report the duration between the storm event it sampled at the Seffner Facility and the end of the previous measurable (greater than 0.1" rainfall) storm event, as required by MSGP Part XI.N.5.a(1), for samples taken on the following dates: February 2, 2015; June 27, 2015; September 29, 2015; and June 7, 2017.

127.    On information and belief, Plaintiffs allege that Trademark Metals failed to take and monitor any samples from four required storm events during 2017 and failed to take and monitor samples from two required storm events during 2015 at the Seffner Facility consistent with the requirements in MSGP Part XI.N.5.a.2.

128.    On information and belief, Plaintiffs allege that since at least March 20, 2015, Defendant has failed to implement BAT and BCT at the Seffner Facility for its discharges of aluminum, copper, iron, lead, zinc, chemical oxygen demand, total suspended solids, and other pollutants.  As of the date of this Complaint, Defendant has failed to implement BAT and BCT.

129.    As a result of Trademark Metals' practices at the Seffner Facility, storm water containing excessive pollutants is being discharged from the Seffner Facility during rain events into the Seffner Facility Receiving Waters.

130.    Information available to Plaintiffs indicates that Defendant has not fulfilled the requirements set forth in the MSGP for discharges from the Seffner Facility due to the continued

discharge of contaminated storm water.  Plaintiffs are informed and believe, and thereupon allege, that all of the violations alleged in this Complaint are ongoing and continuous.

**Violations at Sarasota Facility**

131.    Defendant owns and/or operates the Sarasota Facility, a metal recycling facility located in Sarasota, FL.

132.    Based on Plaintiffs' investigation, including a review of the Sarasota Facility's NOI, aerial photography, and Plaintiffs' information and belief, storm water is collected and discharged from the Sarasota Facility via at least two outfalls.  Storm water discharged from the Sarasota Facility flows into unnamed channels that flow into Whitaker Bayou and then into Sarasota Bay (collectively, "Sarasota Facility Receiving Waters").

133.    Information available to Plaintiffs indicates that the Sarasota Facility Receiving Waters are waters of the United States.

134.    The Sarasota Facility's current coverage under the MSGP is active from September 16, 2016, through September 15, 2021.  This is a continuation from the Sarasota Facility's previous coverage under the MSGP, which ran from October 3, 2011, through October 12, 2016.

135.    Since at least January 27, 2012, Defendant has taken samples or arranged for samples to be taken of storm water discharges at the Sarasota Facility.  The sample results were reported in the Sarasota Facility's DMRs submitted to the DEP.  Defendant certified the accuracy of each of those DMRs.

136.    In DMRs submitted to the DEP, the Sarasota Facility has consistently reported high pollutant levels from its storm water sampling results.

137.    The levels of aluminum in storm water detected by the Sarasota Facility have exceeded the cut-off concentration for aluminum of 0.75 mg/L established by the DEP in every storm water taken at the facility for the past six years.  For example, on June 27, 2014, the level of aluminum measured at one of the Sarasota Facility's storm water outfalls was 9.32 mg/L, which is over 12 times the cut-off concentration.  Defendant also has measured levels of

aluminum in excess of 0.75 mg/L in storm water discharged from the Sarasota Facility on September 22, 2014; February 22, 2017; May 24, 2017; March 16, 2019; and July 22, 2019.

138.    The levels of copper in storm water detected by the Sarasota Facility have exceeded the cut-off concentration for copper of 0.0636 mg/L established by the DEP in almost every storm water taken at the facility for the past eight years.  For example, on June 27, 2014, the level of copper measured at one of the Sarasota Facility's storm water outfalls was 0.659 mg/L, which is over 10 times the cut-off concentration.  Defendant also has measured levels of copper in excess of 0.0636 mg/L in storm water discharged from the Sarasota Facility on January 27, 2012; June 1, 2012; October 3, 2012; September 22, 2014; February 22, 2017; May 24, 2017; March 16, 2019; and July 22, 2019.

139.    The levels of iron in storm water detected by the Sarasota Facility have exceeded the cut-off concentration for iron of 1.0 mg/L established by the DEP in ever storm water sample taken at the facility for the past six years.  For example, on June 27, 2014, the level of iron measured at one of the Sarasota Facility's storm water outfalls was 17.4 mg/L, which is over 17 times the cut-off concentration.  Defendant also has measured levels of iron in excess of 1.0 mg/L in storm water discharged from the Sarasota Facility on September 22, 2014; February 22, 2017; May 24, 2017; March 16, 2019; and July 22, 2019.

140.    The levels of lead in storm water detected by the Sarasota Facility have exceeded the cut-off concentration for lead of 0.0816 mg/L established by the DEP.  For example, on June 27, 2014, the level of lead measured at one of the Sarasota Facility's storm water outfalls was 0.284 mg/L, which is 3.5 times the cut-off concentration.  Defendant also measured levels of lead in excess of 0.0816 mg/L in storm water discharged from the Sarasota Facility on September 22, 2014.

141.    The levels of zinc in storm water detected by the Sarasota Facility have exceeded the cut-off concentration for zinc of 0.117 mg/L established by the DEP in every storm water sample taken at the facility for the past six years.  For example, on June 27, 2014, the level of zinc measured at one of the Sarasota Facility's storm water outfalls was 2.24 mg/L, which is over

19 times the cut-off concentration.  Defendant also has measured levels of zinc in excess of 0.117 mg/L in storm water discharged from the Sarasota Facility on September 22, 2014; February 22, 2017; May 24, 2017; March 16, 2019; and July 22, 2019.

142.    The levels of chemical oxygen demand in storm water detected by the Sarasota Facility have exceeded the cut-off concentration for chemical oxygen demand of 120 mg/L established by the DEP in almost every storm water sample taken at the facility for the past six years.  For example, on September 22, 2014, the level of chemical oxygen demand measured at one of the Sarasota Facility's storm water outfalls was 1060 mg/L, which is almost 9 times the cut-off concentration.  Defendant also has measured levels of chemical oxygen demand in excess of 120 mg/L in storm water discharged from the Sarasota Facility on January 27, 2012; June 27, 2014; February 22, 2017; May 24, 2017; and March 16, 2019.

143.    The levels of total suspended solids in storm water detected by the Sarasota Facility have exceeded the cut-off concentration for total suspended solids of 100 mg/L established by the DEP.  For example, on September 22, 2014, the level of total suspended solids measured at one of the Sarasota Facility's storm water outfalls was 415 mg/L, which is over 4 times the cut-off concentration.

144.    On February 6, 2015, the DEP sent Trademark Metals a letter regarding exceedances of the cut-off concentrations for pollutants of concern at the Sarasota Facility.  This letter requested "appropriate action(s)" to address the exceedances, including, *inter alia*, re-evaluating the effectiveness of the pollution prevention measures and controls identified in the Facility's SWPPP and documenting the results of this review in the SWPPP.  On information and belief, Plaintiffs allege that Trademark Metals failed to take appropriate actions to address the exceedances and to then appropriately revise the SWPPP for the Sarasota Facility.

145.    On July 3, 2018, the DEP set Trademark Metals a letter subsequent to a May 1, 2018 NPDES inspection at the Sarasota Facility.  This letter noted items of concern in an attached inspection report.  That report indicated, *inter alia*, that the Sarasota Facility failed to properly operate/maintain best management practices, and that the Facility's SWPPP is

incomplete.  The DEP required that Trademark Metals respond within 15 days of receipt.  On information and belief, Plaintiffs allege that Trademark Metals has failed to respond to the DEP's letter and failed to accordingly update its BMPs and SWPPP.

146.    On information and belief, Plaintiffs allege that Trademark Metals failed to accurately report the duration between the storm event it sampled at the Sarasota Facility and the end of the previous measurable (greater than 0.1" rainfall) storm event, as required by MSGP Part XI.N.5.a(1) on February 22, 2017, and March 16, 2019.

147.    On information and belief, Plaintiffs allege that Trademark Metals failed to take and monitor any samples from four required storm events during 2017 and from three required storm events during 2019 at the Sarasota Facility consistent with the requirements in MSGP Part XI.N.5.a(2).

148.    On information and belief, Plaintiffs allege that during 2017 Trademark Metals failed to take and analyze storm water discharges at all storm water discharge locations at the Sarasota Facility as required by MSGP Part XI.N.5.a.  Trademark Metals indicated two different, separate outfall locations on past NOIs submitted at the Sarasota Facility.  During 2014, Trademark Metals sampled storm water discharges from three different locations at the Sarasota Facility.  During 2017, it only sampled from one of these locations.

149.    On information and belief, Plaintiffs allege that since at least March 20, 2015, Defendant has failed to implement BAT and BCT at the Sarasota Facility for its discharges of aluminum, copper, iron, lead, zinc, chemical oxygen demand, total suspended solids, and other pollutants.  As of the date of this Complaint, Defendant has failed to implement BAT and BCT.

150.    As a result of Trademark Metals' practices at the Sarasota Facility, storm water containing excessive pollutants is being discharged from the Sarasota Facility during rain events into the Sarasota Facility Receiving Waters.

151.    Information available to Plaintiffs indicates that Defendant has not fulfilled the requirements set forth in the MSGP for discharges from the Sarasota Facility due to the continued discharge of contaminated storm water.  Plaintiffs are informed and believe, and

thereupon allege, that all of the violations alleged in this Complaint are ongoing and continuous.

### Violations at Clearwater Facility

152.    Defendant owns and/or operates the Clearwater Facility, a metal recycling facility located in Clearwater, FL.

153.    Based on Plaintiffs' investigation, including a review of the Clearwater Facility's NOI, aerial photography, and Plaintiffs' information and belief, storm water is collected and discharged from the Clearwater Facility via at least one outfall.  Storm water discharged from the Clearwater Facility flows into is Old Tampa Bay via Alligator Creek ("Clearwater Facility Receiving Waters").

154.    Information available to Plaintiffs indicates that the Clearwater Facility Receiving Waters is a water of the United States.

155.    The Clearwater Facility's current coverage under the MSGP is active from April 13, 2019, through April 12, 2024.  This is a continuation from the Clearwater Facility's previous coverage under the MSGP, which ran from May 9, 2014, through May 8, 2019.

156.    Since at least February 9, 2015, Defendant has taken samples or arranged for samples to be taken of storm water discharges at the Clearwater Facility.  The sample results were reported in the Clearwater Facility's DMRs submitted to the DEP.  Defendant certified the accuracy of each of those DMRs.

157.    In DMRs submitted to the DEP, the Clearwater Facility has consistently reported high pollutant levels from its storm water sampling results.

158.    The levels of aluminum in storm water detected by the Clearwater Facility has exceeded the cut-off concentration for aluminum of 0.99 mg/L established by the DEP.  On August 19, 2015, the level of aluminum measured at the Clearwater Facility's storm water outfall was 0.99 mg/L.

159.    The level of copper in storm water detected by the Clearwater Facility has exceeded the cut-off concentration for copper of 0.0636 mg/L established by the DEP.  On August 19, 2015, the level of copper measured at the Clearwater Facility's storm water outfall

was 0.149 mg/L, which is over twice the cut-off concentration.  Defendant also has measured levels of copper in excess of 0.0636 mg/L in storm water discharged from the Clearwater Facility on June 5, 2017.

160.    The level of lead in storm water detected by the Clearwater Facility has exceeded the cut-off concentration for lead of 0.0816 mg/L established by the DEP.  On June 5, 2017, the level of lead measured at the Clearwater Facility's storm water outfall was 0.102 mg/L.

161.    The levels of zinc in storm water detected by the Clearwater Facility have exceeded the cut-off concentration for zinc of 0.117 mg/L established by the DEP in almost every storm water sample taken at the facility for the past five years.  For example, on June 5, 2017, the level of zinc measured at the Clearwater Facility's storm water outfall was 2.96 mg/L, which is over 25 times the cut-off concentration.  Defendant also has measured levels of zinc in excess of 0.117 mg/L in storm water discharged from the Clearwater Facility on February 9, 2015; June 22, 2015; and August 19, 2015.

162.    On March 28, 2018, the DEP sent Trademark Metals a letter regarding exceedances of the cut-off concentrations for pollutants of concern at the Clearwater Facility.  This letter requested "appropriate action(s)" to address the exceedances, including, *inter alia*, re-evaluating the effectiveness of the pollution prevention measures and controls identified in the Facility's SWPPP and documenting the results of this review in the SWPPP.  On information and belief, Plaintiffs allege that Trademark Metals failed to take appropriate actions to address the exceedances and to then appropriately revise the SWPPP for the Clearwater Facility.

163.    On information and belief, Plaintiffs allege that Trademark Metals failed to accurately report the duration between the storm event it sampled at the Clearwater Facility and the end of the previous measurable (greater than 0.1" rainfall) storm event, as required by MSGP Part XI.N.5.a(1) on the following dates: February 9, 2015; June 22, 2015; August 19, 2015; and October 27, 2015.

164.    On information and belief, Plaintiffs allege that Trademark Metals failed to take and monitor any samples from four required storm events during both 2017 and 2015 at the

Clearwater Facility consistent with the requirements in MSGP Part XI.N.5.a(2):

165.    On information and belief, Plaintiffs allege that since at least March 20, 2015, Defendant has failed to implement BAT and BCT at the Clearwater Facility for its discharges of aluminum, copper, lead, zinc, and other pollutants.  As of the date of this Complaint, Defendant has failed to implement BAT and BCT.

166.    As a result of Trademark Metals' practices at the Clearwater Facility, storm water containing excessive pollutants is being discharged from the Clearwater Facility during rain events into the Clearwater Facility Receiving Waters.

167.    Information available to Plaintiffs indicates that Defendant has not fulfilled the requirements set forth in the MSGP for discharges from the Clearwater Facility due to the continued discharge of contaminated storm water.  Plaintiffs are informed and believe, and thereupon allege, that all of the violations alleged in this Complaint are ongoing and continuous.

## VI.    <u>CLAIMS FOR RELIEF</u>

**<u>FIRST CAUSE OF ACTION</u>**
**Failure to Implement the Best Available and**
**Best Conventional Treatment Technologies**
**(Violations of MSGP and the Act, 33 U.S.C. §§ 1311, 1342)**

168.    Plaintiffs re-allege and incorporate all of the preceding paragraphs as if fully set forth herein.

169.    The MSGP's SWPPP requirements oblige Sector N dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  Defendant has failed to implement BAT and BCT at the Sutton Facility for their discharges of aluminum, copper, iron, lead, zinc, and other un-monitored pollutants in violation of Part XI.N of the MSGP.

170.    Defendant has failed to implement BAT and BCT at the Port Sutton Shredder Facility for their discharges of aluminum, copper, iron, lead, zinc, chemical oxygen demand, total suspended solids, and other pollutants in violation of Part XI.N of the MSGP.

171.    Defendant has failed to implement BAT and BCT at the Export Yard Facility for their discharges of aluminum, copper, iron, lead, zinc, chemical oxygen demand, and other pollutants in violation of Part XI.N of the MSGP.

172.    Defendant has failed to implement BAT and BCT at the Seffner Facility for their discharges of aluminum, copper, iron, lead, zinc, chemical oxygen demand, total suspended solids, and other pollutants in violation of Part XI.N of the MSGP.

173.    Defendant has failed to implement BAT and BCT at the Sarasota Facility for their discharges of aluminum, copper, iron, lead, zinc, chemical oxygen demand, total suspended solids, and other pollutants in violation of Part XI.N of the MSGP.

174.    Defendant has failed to implement BAT and BCT at the Clearwater Facility for their discharges of aluminum, copper, lead, zinc, and other pollutants in violation of Part XI.N of the MSGP.

175.    Each day since March 20, 2015, that Defendant has failed to develop and implement BAT and BCT in violation of the MSGP is a separate and distinct violation of the MSGP and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

176.    Defendant has been in violation of the BAT/BCT requirements every day since March 20, 2015.  Defendant continues to be in violation of the BAT/BCT requirements each day that they fail to develop and fully implement BAT/BCT at the Sutton Facility, Port Sutton Shredder Facility, Export Yard Facility, Seffner Facility, Sarasota Facility, and the Clearwater Facility.

**SECOND CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**Adequate Storm Water Pollution Prevention Plans**
**(Violations of MSGP and the Act, 33 U.S.C. §§ 1311, 1342)**

177.    Plaintiffs re-allege and incorporate all of the preceding paragraphs as if fully set forth herein.

178.    The MSGP requires Sector N dischargers to develop, implement, and revise an

adequate SWPPP.

179.    Defendant has failed to develop and implement an adequate SWPPP for the Sutton Facility, Port Sutton Shredder Facility, Export Yard Facility, Seffner Facility, Sarasota Facility, and the Clearwater Facility, respectively.  Defendant's ongoing failure to develop and implement adequate SWPPPs for the Sutton Facility, Port Sutton Shredder Facility, Export Yard Facility, Seffner Facility, Sarasota Facility, and the Clearwater Facility is evidenced by, *inter alia*, by sources of storm water contamination at each of the TMR Facilities, contaminant tracking around and off the Facilities, and the Facilities' discharges of storm water contaminated above pollutant levels without the requisite application of BAT/BCT.

180.    Defendant has failed to update the SWPPPs for the Sutton Facility, Port Sutton Shredder Facility, Export Yard Facility, Seffner Facility, Sarasota Facility, and the Clearwater Facility in response to the analytical results of the facilities' storm water monitoring.

181.    Each day since March 20, 2015, that Defendant has failed to develop, implement and update an adequate SWPPP for the Sutton Facility, Port Sutton Shredder Facility, Export Yard Facility, Seffner Facility, Sarasota Facility, and the Clearwater Facility, respectively, is a separate and distinct violation of the MSGP and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

182.    Defendant has been in violation of the SWPPP requirements every day since March 20, 2015.  Defendant continues to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for the Sutton Facility, Port Sutton Shredder Facility, Export Yard Facility, Seffner Facility, Sarasota Facility, and the Clearwater Facility, respectively.

### THIRD CAUSE OF ACTION
**Failure to Conduct Adequate
Comprehensive Site Compliance Evaluations
(Violation of MSGP and the Act, 33 U.S.C. §§ 1311, 1342)**

183.    Plaintiffs re-allege and incorporate all of the preceding paragraphs as if fully set forth herein.

184.    The MSGP requires Sector N dischargers to conduct comprehensive site compliance evaluations at least once per year, including a comprehensive review of a facility and its storm water pollution control measures and subsequent revision of a facility's SWPPP.

185.    Defendant has failed to conduct adequate annual comprehensive site compliance evaluations for the Sutton Facility, Port Sutton Shredder Facility, Export Yard Facility, Seffner Facility, Sarasota Facility, and the Clearwater Facility, respectively.

186.    Defendant's ongoing failure to conduct adequate annual comprehensive site compliance evaluations are evidenced by, *inter alia*, Defendant's failure to respond to numerous requests from the DEP to take additional actions to address exceedances at the TMR Facilities and to updates the SWPPPs for the TMR Facilities.

187.    Each day since at least March 20, 2015, that Defendant has failed to conduct adequate annual comprehensive site compliance evaluations for the Sutton Facility, Port Sutton Shredder Facility, Export Yard Facility, Seffner Facility, Sarasota Facility, and the Clearwater Facility, respectively, in violation of the MSGP is a separate and distinct violation of the MSGP and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The failure to conduct adequate annual comprehensive site compliance evaluations are ongoing and continuous violations of the Act.

<u>**FOURTH CAUSE OF ACTION**</u>
**Failure to Develop and Implement**
**Adequate Monitoring and Reporting Programs**
**(Violation of MSGP and the Act, 33 U.S.C. §§ 1311, 1342)**

188.    Plaintiffs re-allege and incorporate all of the preceding paragraphs as if fully set forth herein.

189.    The MSGP requires Sector N facility operators to implement monitoring and reporting requirements that will allow facility operators to determine whether they have adequately reduced the level of pollutants in storm water runoff through the development and proper implementation of the facility's SWPPP.

190.    Defendant has failed to develop and implement an adequate monitoring and

reporting program for the Sutton Facility, Port Sutton Shredder Facility, Export Yard Facility, Seffner Facility, Sarasota Facility, and the Clearwater Facility, respectively.

191.    Defendant's ongoing failure to develop and implement an adequate monitoring and reporting program are evidenced by, *inter alia*, their practice of taking storm water samples on dates subsequent to large storm events, as well as their frequent reporting that no discharges occurred from the Facilities despite evidence of numerous potential sampling events during a given reporting period.

192.    Each day since at least March 20, 2015, that Defendant has failed to develop and implement an adequate monitoring and reporting program for the Sutton Facility, Port Sutton Shredder Facility, Export Yard Facility, Seffner Facility, Sarasota Facility, and the Clearwater Facility, respectively, in violation of the MSGP is a separate and distinct violation of the MSGP and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

## VII.    RELIEF REQUESTED

Wherefore, Plaintiffs respectfully request that this Court grant the following relief:

a.    Declare Defendant to have violated and to be in violation of the Act as alleged herein;

b.    Enjoin Defendant from discharging polluted storm water from the Sutton Facility, Port Sutton Shredder Facility, Export Yard Facility, Seffner Facility, Sarasota Facility, and the Clearwater Facility, respectively, unless authorized by the MSGP;

c.    Enjoin Defendant from further violating the substantive and procedural requirements of the MSGP;

d.    Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e.    Order Defendant to comply with the MSGP's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

f.   Order Defendant to prepare SWPPPs for the Sutton Facility, Port Sutton Shredder Facility, Export Yard Facility, Seffner Facility, Sarasota Facility, and the Clearwater Facility consistent with the MSGP's requirements and implement procedures to regularly review and update the SWPPPs;

g.   Order Defendant to provide Plaintiffs with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

h.   Order Defendant to pay civil penalties of up to $37,500 per day per violation for all violations occurring on or before November 2, 2015, and $55,800 for violations occurring after November 2, 2015, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

i.   Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

j.   Award Plaintiffs' costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

k.   Award any such other and further relief as this Court may deem appropriate.


Dated: May 20, 2020                     Respectfully submitted,

                                        By:      _/s/ Justin Bloom_____

                                        Justin Bloom
                                        Trial Counsel
                                        Florida Bar #89109
                                        Justin Bloom Attorney at Law, PA
                                        P.O. Box 1028
                                        Sarasota, FL 34230
                                        Telephone: (941) 275-2922
                                        Facsimile: (866) 574-2169
                                        Email: bloomesq1@gmail.com

                                        *Attorney for Plaintiffs* SUNCOAST WATERKEEPER,
                                        TAMPA BAY WATERKEEPER, OUR CHILDREN'S
                                        EARTH FOUNDATION